**DRAFT**
Dated: 1/6/00

# OPERATING AGREEMENT OF
# ULTIMATE SYSTEMS, LTD.

This Operating Agreement ("Operating Agreement") of Ultimate Systems, Ltd., an Ohio limited liability company (the "Company"), is made and entered into effective as of the Organization Date by and among Robert T. Horstman, Jr., Richard Allen Horstman, David E. Fanning and Lynx Services Limited, each as members of the Company.

## ARTICLE I
## ORGANIZATION

1.1   **Organization.** Articles of Organization were filed with the Ohio Secretary of State on the Organization Date, creating Ultimate Systems, Ltd., a limited liability company, organized and to be operated in compliance with the provisions of the Act (as hereinafter defined). The rights and liabilities of the Members are as provided in the Act except as provided in this Operating Agreement.

1.2   **Name.** The name of the Company is "Ultimate Systems, Ltd."

1.3   **Registered Office and Registered Agent.** The Company's registered office and its registered agent are as set forth in the Articles of Organization of the Company and may be changed from time to time, as the Members deem necessary or advisable.

1.4   **Principal Office.** The location of the principal office and place of business of the Company is 1430 N. Main, P.O. Box 466, Delphos, Ohio 45833, or such other location as the Members may from time to time determine. At this principal office, the Company shall maintain its records as required by Section 1705.28 of the Act.

1.5   **Term.** The Company commenced on the date the Articles of Organization were filed and will continue until it is dissolved, terminated and wound up in accordance with the provisions of this Operating Agreement.

1.6   **Purpose.** The purpose of the Company is to engage in any activities for which a limited liability company may be formed under the Act.

## ARTICLE II
## DEFINITIONS

The terms defined in this Article, whenever used in this Agreement and capitalized, have the following meanings:

2.1   "**Act**" means the Ohio Limited Liability Company Act, as codified in Chapter 1705 of the Ohio Revised Code, as now enacted or hereafter amended.


EXHIBIT A

2.2 "**Code**" means the Internal Revenue Code of 1986, as amended.

2.3 "**Excess Cash**" means the amount of cash and cash equivalents (from whatever source) of the Company on hand from time to time, which the Members determine is in excess of the current reasonably anticipated needs of the Company.

2.4 "**Fair Market Value**" means, with respect to any interest in the Company, the fair market value, as of the date of determination, determined by the Company in consultation with an independent appraiser selected by the Company.

2.5 "**Member**" means each party to this Agreement and any person admitted as an additional or substitute Member in accordance with this Agreement, in that person's capacity as a Member.

2.6 "**Member Vote**" means (i) the vote, pursuant to Article V hereof, of those Members holding at least a majority of the Membership Interests then held among the Members, or (ii) the written consent of the Members as provided in Article V hereof.

2.7 "**Membership Interest(s)**" means the interest in the Company's profits and losses at the time of determination. The Membership Interest initially held by each Member is set forth in Section 4.1 hereof.

2.8 "**Option Event**" means the occurrence of one or more of the following events:

(a) the Bankruptcy of a Member, or the appointment of a receiver, executor, administrator, guardian, legal committee, or other legal custodian of such Member's property (including any interest in the Company owned by such Member);

(b) a Member Transfers (as hereafter defined) any interest in the Company in violation of this Agreement; or

(c) a writ of attachment or other court order prevents a Member from exercising its voting and other rights with respect to any of its interest in the Company.

An Option Event shall be deemed to be continuing until the procedures set forth in Section 8.4 of this Operating Agreement with respect to the Membership Interest affected thereby have been exhausted.

2.9 "**Organization Date**" means December 9, 1999.

2.10 "**Prohibited Transferee**" means any person receiving or holding any interest of the Company directly or indirectly as a result of the occurrence of any Option Event.

2.11 **"Treasury Regulations"** means the rules and regulations promulgated by the United States Department of the Treasury pursuant to the Code, as amended from time to time.

## ARTICLE III
## CAPITAL CONTRIBUTIONS AND INTEREST IN THE COMPANY

3.1 **Capital Contributions.** The Members are not initially required to make any contribution to the capital of the Company. From time to time, if the Members unanimously agree that capital is needed, the Members shall contribute to the capital of the Company money or other property acceptable to the Members in proportion to the Membership Interest held by that Member.

3.2 **Failure to Contribute Required Capital.** If any Member fails to contribute its share of any additional capital required to be contributed pursuant to Section 3.1 above, the other Members, after fifteen (15) days prior notice in writing, may make such contribution, thereby increasing not only the contributing Member's capital account, but also such Member's Membership Interest. In such event, the Membership Interest of each Member shall be recalculated based upon the amount or fair market value of the new capital contribution plus the amount or fair market value of such Member's prior capital contribution divided by the amount or fair market value of all capital contributions.

3.3 **Capital Accounts.** The Company shall maintain a separate capital account for each Member. The capital account of each Member shall be (a) credited by the amount of money and the fair market value of any other property contributed to the Company pursuant to Sections 3.1 and 3.2; (b) appropriately adjusted for such Member's allocations of the profits, gains, losses and deductions for each fiscal year; (c) debited by the amount of cash and the fair market value of property or distributions made by the Company to such Member from time to time; and (d) otherwise adjusted in accordance with Code Section 704 and relevant Treasury Regulations. Further, the capital accounts of the Members shall be adjusted from time to time to reflect the unrealized appreciation or depreciation in the assets of the Company if necessary to properly reflect the interests of the Members in connection with a non-pro rata capital contribution or distribution.

3.4 **Limited Liability.** The Members shall have no personal liability for liabilities or obligations of the Company, except to the extent of their capital contributions. The Members shall not be required to make additional contributions or to advance or lend money to the Company for any purpose unless agreed to as provided in Section 3.1.

3.5 **Withdrawal of Capital.** The Members are not entitled to withdraw or receive any portion of their capital account other than as determined by the Members from time to time or as specifically provided for in this Agreement.

3.6 **No Interest on Capital Contributions.** No interest will be paid to any Member on any contribution to the capital of the Company.

3.7 **Loans from the Members**. If any Member advances any funds to the Company in excess of his required contributions to the capital of the Company, the amount of any such advance will not be deemed a capital contribution, but will be an obligation of the Company to such Member and shall be repaid by the Company on such terms as the Members shall agree as of the date of the advance.

## ARTICLE IV
## ALLOCATION OF NET PROFIT AND NET LOSSES; DISTRIBUTION OF EXCESS CASH RECEIPTS

4.1 **Allocation of Net Profits and Net Losses**. The Company shall determine profits and losses for each fiscal year and shall allocate them among the Members in proportion to their respective Membership Interests. If the Membership Interest of a Member changes during the year, profits and losses shall be allocated to reflect the varying interest in a manner selected by the Members that is consistent with Code Section 706(d). Initially, the Membership Interest of each Member is:

| | |
|---|---|
| Robert T. Horstman, Jr. | 25% |
| Richard Allen Horstman | 25% |
| David E. Fanning | 25% |
| Lynx Services Limited | 25% |

4.2 **Certain Allocations**. Notwithstanding Section 4.1 hereof, for federal income tax purposes, income, gains, losses and deductions attributable to contributed property and property revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) shall be allocated to the Members so as to take into account the difference between the tax basis of the property and its fair market value at the time of contribution to the Company or revaluation using any method selected by the Members that is permitted by Code Section 704(c) and relevant Treasury Regulations.

4.3 **Distributions**. The Company shall distribute the Company's Excess Cash to the Members in proportion to their respective Membership Interests, at such times and in such amounts as agreed to by Members holding at least seventy-five percent (75%) of the Membership Interest in the Company. The Company may distribute property in kind only with the approval of all of the Members. Immediately prior to any distribution of property in kind, the capital accounts of the Members shall be adjusted to reflect the income or loss that would be recognized by the Company if the property to be distributed was sold at its fair market value on that date. Any amount withheld with respect to a Member pursuant to Section 7.7 hereof shall be treated, for all purposes of this Agreement, as amounts distributed to such Member.

## ARTICLE V
## MANAGEMENT AND OPERATION

5.1 **Management and Control of the Company.** The management and control of the Company is reserved to its Members. The Members agree that they shall jointly exercise control of the day-to-day conduct, operation and management of the business of the Company, all in accordance with the terms of this Agreement. Except when this Agreement or the Act requires the consent or approval of the Members before taking any action, each Member has the authority to act on behalf of and bind the Company in the management of its affairs. Each Member shall manage the affairs of the Company in a prudent and businesslike fashion and shall use the Member's best efforts to carry out the purposes and character of the business of the Company. Each Member shall undertake all acts necessary or desirable to protect the Company's business and assets. Each Member is required to devote only such time to the conduct of the Company's business as is reasonably necessary to perform his duties as required by this Agreement or the Act.

5.2 **Limitations on Authority of Members.** Notwithstanding the general grant of authority to the Members in Section 5.1, no Member may take or engage in any of the following actions in the name of or on behalf of the Company unless approved by a Member Vote as provided in Section 5.4:

(a) Purchase, sell, assign or convey any interest in real estate;

(b) Mortgage or pledge all or part of any assets of the Company as security for any debt;

(c) Compromise or release any claims or debts of the Company that exceed $5,000;

(d) Incur any debt on behalf of the Company in excess of $5,000;

(e) Make any single expenditure or series of related expenditures out of the ordinary course of business exceeding $5,000 other than for regularly scheduled debt service or in the payment of any amount owing under a contract previously authorized by the Members;

(f) Enter into any contract on behalf of the Company that would obligate the Company to take any of the actions described in subsections (a) through (e) above;

(g) Admit any additional Members; and

(h) Exercise any right or option provided in Sections 8.3 and 8.4 hereof; provided, however, for purposes of this Section 5.2(h) only, a Member Vote shall mean approval by a majority of the Membership Interest held by non-selling or non-defaulting Members.

5.3   **Other Business Ventures**. Each of the Members may engage in and possess an interest in any other professional or business venture of any nature or description whatsoever, independently or with others, including, but not limited to, the acquisition, ownership and operation of ventures competitive with, and similar in nature to, the business conducted by the Company. Neither the Company nor any other Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

5.4   **Action by Members**. When the approval of the Members by a Member Vote is required by this Agreement or the Act, the Members may take such actions with or without a meeting. In the event that a meeting is called, all of the Members must be given notice of the meeting or the solicitation of approval of the action without a meeting at least two (2) business days prior to the date the meeting will be held. Members may participate in a meeting by telephone conference call or other similar communications equipment provided all Members participating in the meeting can hear and speak to each other. The Members shall keep records of all such actions indicating how each member voted on the proposed action. The attendance of a Member at any meeting without protesting, prior to or at the commencement of the meeting, the lack of proper notice shall be deemed to be a waiver by him of notice of such meeting.

5.5   **Liability of Members**. No Member will be liable, responsible or accountable in damages or otherwise to the other Members for any acts performed by that Member in good faith within the scope of the authority conferred upon that Member by this Agreement.

5.6   **Indemnity**. The Company shall indemnify any Member against any cost or expense reasonably incurred by such Member in connection with any threatened, pending or completed action or other proceeding by reason of his or her service to or membership in the Company to the maximum extent permitted under Ohio law including, but not limited to, the right to be advanced expenses, including attorneys' fees, incurred in defending any such action or proceeding.

5.7   **Reimbursement for Expenses**. The Company shall reimburse each Member for all reasonable and authorized out-of-pocket expenses the Member incurs on behalf of the Company, provided that reimbursement is made by issuance of a check drawn on a Company account, signed on behalf of the Company by a Member other than the Member seeking reimbursement. Any Member seeking reimbursement shall furnish an itemized written statement which satisfies the expense substantiation requirements of the Code and sets forth the business purpose of the expenses.

5.8   **By-Laws**. The Members may adopt by-laws that are not inconsistent with the Act, the Articles of Organization or this Agreement for the regulation of Members and other matters affecting the management of the Company and meetings of the Members.

# ARTICLE VI
# DISSOLUTION AND LIQUIDATION

6.1 **Events of Dissolution**. Notwithstanding anything in the Act to the contrary, the Company shall be dissolved only upon the occurrence of any of the following events:

(a) The written agreement of all of the Members that states their election to dissolve the Company;

(b) Upon the sale, exchange or other disposition of all or substantially all of the assets of the Company or other conversion of all or substantially all of the Company's assets to cash.

Section 1705.43(c) of the Act, as amended, shall apply to the Company and this Agreement, and the withdrawal of a Member shall not cause the dissolution of the Company except as specifically provided in this Agreement.

6.2 **Winding Up and Termination**. If the Company is dissolved pursuant to Section 6.1, the Company shall be liquidated and the business and affairs of the Company shall be wound up in accordance with applicable provisions of the Act and, in settling the accounts of the Company, the assets and other property of the Company shall be distributed in the following order of priority after all income and loss for the fiscal year of the sale has been allocated to the Members:

(a) To the payment of all debts and liabilities of the Company and expenses of winding up;

(b) To the establishment of any reserves (to be held in a special interest bearing account) which the Members, by a Member Vote, deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; provided, however, that at the expiration of such time (not to exceed two (2) years from the event which caused dissolution) as the Members, by a Member Vote, deem advisable, the balance of such reserve remaining after payment of such contingent liability shall be distributed in accordance with this section;

(c) To the payment of any loans or advances from any Member or former Member to the Company and amounts owed to former Members in a consideration of their interests in the Company, on a prorata basis;

(d) To the Members in payment of the balance of their respective capital accounts as of the date of such liquidation; and

(e) The balance, if any, to the Members in accordance with their respective Membership Interests.

If the Company plans to distribute any property in kind, prior to that distribution the capital accounts of the Members shall be adjusted to reflect the income or loss that would be realized if the property was sold for its fair market value on the date of distribution.

6.3 **Final Accounting; Notice of Dissolution**. Each of the Members shall be furnished an unaudited statement setting forth the assets and liabilities of the Company as of the date of the winding up of the Company's affairs. Upon compliance with the distribution plan set forth in Section 6.2, a Certificate of Dissolution and any and all other documents necessary with respect to such termination and cancellation shall be filed as required by the Act.

## ARTICLE VII
## BOOKS OF ACCOUNT; REPORTS AND FISCAL MATTERS

7.1 **Books of Account**. The Members shall maintain accurate books of account for the Company and every transaction involving the Company shall be entered therein. The books of account shall be kept at the principal office of the Company. Each Member shall have access to and is entitled to inspect and copy the same, at the Member's expense, during the Company's normal business hours and upon stating a valid business purpose.

7.2 **Accounting Method**. The books of account will be kept on the cash method of accounting, unless the Company's accountant or the Members, by a Member Vote, shall determine that another method is required or advisable.

7.3 **Fiscal Year**. The fiscal year of the Company is the calendar year.

7.4 **Tax Returns**. The Company shall prepare and file its annual tax returns and shall transmit all necessary tax information to the Members within ninety (90) days after the close of each fiscal year.

7.5 **Bank Accounts**. The Members shall select a depository for the funds of the Company and all funds of every kind and nature received by the Company shall be deposited in such account. The Members shall determine from time to time the signature or signatures required to withdraw funds from such accounts.

7.6 **Section 754 Election**. If a distribution of property is made in the manner provided in Section 734 of the Code, or in the event of a transfer of any interest in the Company made in the manner provided in Section 743 of the Code, the Members, on behalf of the Company, may, but shall not be required to, file an election under Section 754 of the Code in accordance with the procedures established in the applicable regulations promulgated thereunder.

7.7 **Foreign Members and Non-Ohio Resident Members.**

    7.7.1 Each Member is to deliver to the Company such documentation as may be required by the Company to determine to the satisfaction of the Company (and as may otherwise be required by law) whether such Member is a

"foreign partner," a "foreign person," or a "United States person," as those terms are described and defined in Code Sections 1446(e) and 7701(a). If a Member fails to execute and deliver to the Company a nonforeign affidavit or provide the Company with other satisfactory evidence as to its foreign status in accordance with the provisions of this Section 7.7.1, then: (i) the Company shall be entitled hereby to withhold from allocations and distributions to that Member the amounts required by the Code; (ii) that Member shall contribute to the Company, as and when requested by the Treasurer, an amount equal to the amount of tax the Company will be required to pay over to the Internal Revenue Service under Section 1446 of the Code or any other provisions of the Code by reason of such Member's status as a "foreign partner" or "foreign person"; and (iii) that Member (the "Foreign Member") shall indemnify, defend, and hold harmless the Company and each and every other Member from and against any and all claims and assessments that may be asserted by any foreign, federal, state, or local tax authority with respect to such Foreign Member.

7.7.2   Each Member is to deliver to the Company such documentation as may be required by the Company to determine to the satisfaction of the Company (and as may otherwise be required by law) whether such Member is a "qualifying investor" as that term is described and defined in Section 5733.40 of the Ohio Revised Code, as amended. If a Member fails to execute and deliver to the Company an affidavit or provide the Company with other satisfactory evidence as to negate his, her, or its status as a "qualifying investor" in accordance with the provisions of this Section 7.7.2, then: (i) the Company shall be entitled hereby to withhold from allocations and distributions to that Member the amounts required by the Ohio Revised Code, as amended; (ii) that Member shall contribute to the Company, as and when requested by the Treasurer, an amount equal to the amount of tax the Company will be required to pay over to the Ohio Department of Taxation under Section 5733.40 of the Ohio Revised Code or any other provisions of the Ohio Revised Code by reason of such Member's status as a "qualifying investor"; and (iii) that Member (the "Non-Ohio Resident Member") shall indemnify, defend, and hold harmless the Company and each and every other Member from and against any and all claims and assessments that may be asserted by any state or local tax authority with respect to such Non-Ohio Resident Member.

## ARTICLE VIII
## **TRANSFER RESTRICTIONS; BUY-SELL AGREEMENTS**

8.1   **Background and Purpose**. The Members have agreed that it is in their mutual best interest to impose restrictions on the transferability of Membership Interests in the Company and to provide procedures for the liquidation of a Member's Membership Interest upon the

occurrence of certain events. This Article supersedes all prior agreements, whether written or oral, relating in any manner to the subject matter of this Article.

8.2 **General Restrictions**. Except for any security interest granted simultaneously by all the Members as security for a loan to fund a mutual business venture and as otherwise specifically provided in this Article, no Member shall sell, assign, transfer, hypothecate, pledge or otherwise dispose of all or any part of his interest in the Company (collectively, a "Transfer"), whether gratuitously or for consideration, or withdraw from the Company without (a) complying with Section 8.3 hereof, or (b) the express written consent of each of the other Members, which consent may be withheld by a Member in his or its sole and unrestricted discretion.

8.3 **Transfer Rights**.

    8.3.1 Subject to the terms and conditions set forth below, if a Member (the "Offering Member") receives one or more bona fide offers (collectively, the "Purchase Offer") to purchase any Membership Interest in the Company (the "Offered Interest") owned by such Member upon specific terms and conditions that such member wishes to accept, then such Member shall promptly notify the Company and each other Member in writing of the terms and conditions of such Purchase Offer (the "Transfer Notice").

    8.3.2 The Company shall have the right and option (subject to the provisions hereof), for a period of thirty (30) days after receipt of any Notice, to elect to purchase all of the Offered Interest at the purchase price and on the terms stated in the Purchase Offer. The Company's notice of exercise of such election (the "Company Notice") shall be delivered to the Offering Member and the other Members concurrently.

    8.3.3 If the Company elects not to purchase all of the Offered Interest, each Member other than the Offering Member shall have the right and option (subject to the provisions hereof), for a period of thirty (30) days after receipt of any Company Notice to elect to purchase all of its pro rata share of the Offered Interest at the purchase price and on the terms stated in the Purchase Offer. Each Member's notice of exercise of such election shall be delivered to the Offering Member, to the Company and to the other Members concurrently.

    8.3.4 The Members shall have a right of oversubscription such that if any Member declines to purchase all of its pro rata share of the Offered Interest, the other Members shall, among them, have the right to purchase up to the balance of the Offered Interest not so purchased. Such right of oversubscription may be exercised by a Member by accepting the offer of the Offered Interest as to more than its pro rata share of the Offered Interest. If as a result thereof, such oversubscriptions exceed the total of the Offered Interest available in respect of such oversubscription privilege,

  the oversubscribing Members shall be reduced with respect to their oversubscriptions on a pro rata basis in accordance with their respective Membership Interests or as they may otherwise agree among themselves.

 8.3.5 Sales of the Offered Interest under the terms hereof shall be made at the offices of the Company on a business day, selected by the Company and the Members electing to purchase the Offered Interest, within sixty (60) days after initial receipt of the Transfer Notice. At the closing, the Offering Member shall deliver a transfer instrument representing the Offered Interest to be purchased hereunder, free of all liens and encumbrances, to the Company or to the purchasing Members, as applicable, and the Company and the purchasing Members, as applicable, shall deliver the purchase price to the Offering Member.

 8.3.6 If the Company and the other Members do not exercise their right to purchase all of the Offered Interest, then the Offering Member may, subject to the provisions of this Agreement, sell all or any part of the remaining Offered Interest at a price not less than the price, and on terms and conditions not more favorable to the purchaser thereof, than the terms and conditions stated in the original Purchase Offer, at any time within ninety (90) days after the expiration of the offer required above. If such Offered Interest is not sold by the Offering Member during such ninety (90) day period, the right of the Offering Member to sell such Offered Interest shall expire and the obligations of this Section 8 shall be reinstated with respect to such interest.

 8.3.7 Notwithstanding anything contained in this Article VIII to the contrary and as a condition precedent to the effectiveness of any proposed Transfer in compliance with this Article VIII, (i) if upon completion of any Transfer, the purchaser or the transferee of the offered Securities or any other person or entity who is an affiliate of such purchaser or other transferee would own and/or control more than fifty percent (50%) of Membership Interest of the Company, then such purchaser or other transferee shall agree, in the manner and upon the terms required by the Company, to purchase from the Members other than the Offering Member (each, a "Remaining Member"), if requested by such Remaining Member, all of the Membership Interest owned by such Remaining Member upon the same terms and subject to the same conditions as negotiated and accepted by the Offering Member.

### 8.4 Option Event Call Right.

 8.4.1 **Call Right.** Upon the occurrence of an Option Event, the Company shall have the right and option, but shall not be obligated, to purchase from the Member (or his, her, or its representative) with respect to whom such Option Event has occurred (the "Defaulting Member") or the Prohibited Transferee, as the case may be, for cash, and at the Fair Market Value of the

Membership Interest, all (but not part) of the such Defaulting Member's Membership Interest in the Company as to which such Option Event has occurred. The exercise by the Company of its rights under this Section 8.4 shall not be subject to the provisions of Article VIII hereof except as otherwise specifically provided in this Section 8.4.

8.4.2 **Manner of Exercise.** If the Company elects to exercise its call right under Section 8.4.1, the Company shall deliver to the Defaulting Member, his representatives or assigns, or the Prohibited Transferee, as the case may be, a written notice, setting a date within thirty (30) days of the date of such notice that it intends to purchase the Defaulting Member's Membership Interest. Any purchase of such Membership Interest effected under the terms of this Section 8.4 shall be made at the offices of the Company on the date specified in the notice given by the Company pursuant to this Section 8.4 (the "Event Closing"). At the Event Closing, the Defaulting Member shall deliver such certificates or other instruments evidencing such Membership Interest duly endorsed for transfer as the Company may require, and the Company shall pay the Fair Market Value of such interest to the Defaulting Member either in lawful United States currency or by delivery to the Defaulting Member of a promissory note, dated as of the date of the Event Closing and providing for payment to the Defaulting Member of an amount equal to the difference between the Fair Market Value of such interest and the amount in cash paid to the Defaulting Member at the Event Closing.

8.4.3 **Call Right Not Exercised.** If any Membership Interest as to which an Option Event occurs are not purchased in accordance with this Section 8.4 for any reason (other than failure of the owner thereof to comply with the provisions of this Agreement), such Membership Interest shall remain subject to this Agreement, including the provisions of Article VIII hereof.

8.5 **Requirements to Transfer.** Any and all Transfers made pursuant to this Article VIII are subject in all respects to the following:

(a) No Transfer shall be made without assurances to the Company, which shall be satisfactory to the Company, that the Transfer does not violate any law applicable to the Company.

(b) The Company may require of the transferor or transferee, as a condition to the approval of such Transfer: (i) (A) registration under the Securities Act and applicable state securities laws, or (B) an opinion of counsel, from counsel and in form and substance satisfactory to the Company, that such Transfer is exempt from registration under the Securities Act and/or applicable state securities laws; and (ii) representations and warranties from the transferee or the transferring Member concerning the facts and circumstances establishing the basis for the availability of exemptions under

the Securities Act and other reasonable assurances relating to any other applicable laws.

(c) As a condition to admission as a substitute Member, an assignee, transferee, legatee, or distributee of all or part of the Membership Interest of any Member shall execute and acknowledge such instruments, in form and substance satisfactory to the Company, as it deems necessary or advisable to effect such admission and to confirm the agreement of the person being admitted as such substitute Member to be bound by all the terms and provisions of this Agreement. Such assignee, transferee, legatee, or distributee shall pay all reasonable expenses in connection with such admission as a substitute Member, including, but not limited to, legal fees and costs incurred by the Company in connection therewith.

(d) If the Company determines that a proposed Transfer would, alone or in conjunction with one or more other Transfers, terminate the Company as a partnership for federal income tax purposes (a "Termination"), the Company may prohibit the proposed Transfer from occurring until the earliest time, as determined by the Company, that the Transfer may occur without causing a Termination. If at any time more than one Transfer is being delayed under this Section 8.3(d), the Transfers are to be made in the order in which the Company received notice of such Transfers.

(e) If a Transfer causes a Termination, the Member making the Transfer shall be liable to the Company and each of the other Members for any taxes, fines, penalties, damages, or losses which may be due as a result of the Termination, including, without limitation, costs of enforcement of the Company's power to void or otherwise prohibit the Transfer or attempted Transfer.

8.6 **Payment to Deceased Member's Estate.** In the case of a Member's death either before or after the Company has exercised its option under this Article VIII, the Company shall pay sums promptly when due to the deceased Member's executor, administrator, legal representative or, if the administration of the estate of such deceased Member shall have been completed and closed, to the beneficiaries entitled thereto.

8.7 **Endorsement of Ownership Certificates.** If the Company issues certificates or other documents evidencing ownership of an interest in the Company such certificates or documents shall be endorsed as follows prior to issuance:

> The interest represented by this certificate is subject to and is transferable only upon compliance with a written Operating Agreement dated effective as of December 9, 1999, a copy of which is on file in the office of the Company. The Company will mail to any Member a copy of such agreement within five (5) days of a written request therefor.

All certificates or other documentation evidencing ownership of an interest in the Company hereafter issued to any person who becomes bound by the terms of this Agreement shall bear the same endorsement.

8.8 **Adjustments and Interest**. The terms and conditions of this Agreement shall apply to any interest in any entity issued to a Member by reason of (a) recapitalizations, (b) mergers, (c) consolidations, (d) combinations, (e) separations, (f) reorganizations, (g) exchange of interest, (h) conversions, (i) incorporation of the company, or (j) other distributions or adjustments.

## ARTICLE IX
## DISSENTING MEMBERS

9.1 **Dissent**. A Member is entitled to relief as a dissenting Member upon the merger or consolidation of the Company to the extent provided in Section 1705.40 of the Act, provided the dissenting Member perfects the right to dissent in compliance with Section 1705.41 of the Act. The Members agree that the fair cash value of the dissenting Member's Membership Interest shall be determined pursuant to Section 8.4 above. If the Company is required to purchase a dissenting Member's Membership Interest, it may do so by paying that amount upon the payment terms described in Section 8.4.

## ARTICLE X
## MISCELLANEOUS

10.1 **Entire Agreement**. This Agreement contains the entire agreement of the Members with respect to the Company. No oral or written agreement or understanding, except an amendment duly adopted in accordance with this Article, affects or amends the terms of this Agreement.

10.2 **Amendment**. This Agreement may be amended only by a writing signed by all Members of the Company.

10.3 **Governing Law**. This Agreement shall be construed and enforced in accordance with the laws of the State of Ohio.

10.4 **Waiver**. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party thereto.

10.5 **Severability**. The invalidity or unenforceability of any provision of this Agreement, whether in whole or in part, shall not in any way affect the validity or enforceability of any other provision herein contained. Any invalid or unenforceable provision shall be deemed severable to the extent of such invalidity or unenforceability. If a determination is made by a

court having jurisdiction that any restriction contained in this Agreement is unreasonable or otherwise unenforceable, the provisions of such clause shall not be rendered void but shall be deemed to be amended so as to be enforceable to the maximum extent as such court may judicially determine or indicate to be reasonable.

10.6 **Binding Effect**. This Agreement shall be binding upon and shall inure to the benefit of the Company, its successors and assigns, and to the Members and their respective heirs, personal representatives, trustees and assigns.

10.7 **Joinder**. Any person who becomes a Member of the Company subsequent to the signing of this Agreement must become a party to this Agreement by signing a joinder agreement, the form of which shall be established by the Company.

10.8 **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one document.

10.9 **Notice**. Notice to the Company may be given at the Company's principal place of business. Notice to the Members shall be at the mailing address for their personal residence as reflected on the most current records of the Company, or any other place the Company or its Members may designate from time to time. All such notices shall be sent registered or certified mail, return receipt requested, or by recognized overnight courier or facsimile. All notices are effective the next day, if sent by recognized overnight courier or facsimile, or five (5) days after deposit in the United States mail, postage prepaid, properly addressed and return receipt requested.

10.10 **Headings**. The section headings contained herein are for convenience of reference only and shall not in any way affect the interpretation or enforceability of any provision of this Agreement.

10.11 **Agreement Drafted by Company Counsel**. Each Member hereby acknowledges that the Company's counsel, Shumaker, Loop & Kendrick, LLP, prepared this Agreement on behalf of and in the course of its representation of the Company and that each Member: (i) has been advised that a conflict may exist between its interest and those of the Company and the other Members; (ii) has been advised by Shumaker, Loop & Kendrick, LLP to seek the advice of independent counsel; and (iii) has had the opportunity to seek the advice of independent counsel.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Members have executed this Agreement as of the Organization Date.

_____
Robert T. Horstman, Jr.


_____
Richard Allen Horstman


_____
David E. Fanning


Lynx Services Limited

By: _____
Name: _____
Its: _____