UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Lynx Services Limited | : | |
| 10 Manoel Street | : | |
| Castries, St. Lucia | : | |
| St. Lucia Island 00124 | : | CASE NO. 3:14-cv-01967-JGC |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | JUDGE CARR |
| Robert T. Horstman | : | |
| PO Box 404 | : | |
| 101 Cambridge Drive | : | |
| Kalida, Ohio 45853 | : | |
| | : | |
| AND | : | **AMENDED COMPLAINT** |
| | : | |
| Richard Horstman | : | |
| PO Box 164 | : | |
| 309 Shoreview Drive | : | **JURY DEMAND ENDORSED HEREON** |
| Kalida, Ohio 45853 | : | |
| | : | |
| AND | : | |
| | : | |
| David Fanning | : | |
| 1430 N. Main Street | : | |
| Delphos, Ohio 45833 | : | |
| | : | |
| AND | : | |
| | : | |
| Robert J. Honigford | : | |
| 121 W. High St., Ste 1200 | : | |
| Lima, Ohio  45801 | : | |
| | : | |
| Defendants. | : | |

**AMENDED COMPLAINT**

1

Now comes Plaintiff, Lynx Services Limited, and pursuant to this Court's June 16, 2015 Order (Doc. #26), and for its Amended Complaint against Defendants, alleges and states as follows:

## INTRODUCTION

1.     This case is about the breach of fiduciary and other duties by three of the members of an Ohio limited liability company (Defendants Ted Horstman, Richard Horstman and David Fanning), who in conspiracy with Defendant Robert J. Honigford, the chief financial officer and in-house general counsel of the LLC at issue in this case, unlawfully squeezed Plaintiff out of the company they created together, for the purpose of preventing Plaintiff from receiving its proper 25% share of the sale of substantially all of the assets of the company, which sale was consummated shortly after the illegal squeeze-out in December 2013.

## PARTIES

2.     Plaintiff, Lynx Services Limited ("Plaintiff" or "Lynx"), is a corporation organized under the International Business Company Act, registered in St. Lucia with its legal domicile in Castries, St. Lucia.

3.     Defendant Robert T. Horstman ("Ted Horstman") is a natural person who, upon information and belief, resides within the geographic boundaries of the Northern District of Ohio, Western Division.

4.     Defendant Richard Horstman ("Richard Horstman") is a natural person who, upon information and belief, resides within the geographic boundaries of the Northern District of Ohio, Western Division.

5.     Defendant David Fanning ("Fanning") is a natural person who, upon information and belief, resides within the geographic boundaries of the Northern District of Ohio, Western Division.

6.     Defendant Robert J. Honigford ("Honigford") is a natural person who, upon information and belief, resides within the geographic boundaries of the Northern District of Ohio, Western Division.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over all of the parties in that it is the judicial district in which one or more of the claims set forth below occurred and it is the district in which one or more of the Defendants reside.

8.     This Court has subject matter jurisdiction under 28 U.S.C. §1332, because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

9.     Venue is proper under 28 USC §1391 in this judicial district because Allen County, Ohio is within the Western Division of the U.S. District Court for the Northern District of Ohio, and is a county in which Defendants conducted activity that gave rise to the claim for relief and a county in which all or part of the claim for relief arose.

## FACTS COMMON TO ALL CLAIMS

### Formation of Ultimate Systems, Ltd. and the Banbury Line

10.     In the 1990s RTH Processing, Inc. ("RTH Processing") was an Ohio company that bought scrap rubber and colored granulated sheeting to produce and sell granulated rubber material to customers in the U.S. only.  Prior to 2000, RTH Processing did not itself manufacture colored rubber material.  Defendants Ted Horstman and Richard Horstman were and remain the sole owners of RTH Processing which, upon information and belief, changed its name to Rubber Grinding, Inc., on or about May 2014.

3

11.    At the same time, Vincent Snell ("Snell"), a U.K. citizen, owned a U.K. company called Millenium Rubber International ("MRI"), which supplied colorized rubber material and polyurethane to customers in the U.S., the U.K., and other countries.

12.    At all times relevant hereto Defendant Ted Horstman was the President of RTH Processing.

13.    In or about 2000, Ted Horstman and Snell devised a plan to combine parts of their respective rubber material businesses into a new Ohio company, which would manufacture and produce colorized rubber material and end-user products such as quality rubber flooring.  This new business would become what was eventually known as Ultimate Systems, Ltd ("Ultimate Systems" or the "Company").

14.    The business combination plan to form Ultimate Systems had five key terms to benefit the new company and the parties:

   a.  MRI would sell rubber mixing equipment and other assets to Ultimate Systems for a production line in Ohio to manufacture colorized rubber material (hereafter referred to as "the Banbury Line");

   b.  MRI would not compete with Ultimate Systems for United States customers in the future, which included the Banbury line;

   c.  RTH Processing would supply its existing product to Ultimate Systems as its new primary customer;

   d.  Snell would be paid two cents for each pound of colorized rubber sold by the Banbury Line to new customers; and

   e.  Snell would be the owner, directly or indirectly, of 33% of Ultimate Systems, with Ted Horstman and David Fanning as the other two members.

15.    Eventually, Ted Horstman requested that Snell accept a smaller membership interest so that Ted's brother, Richard Horstman, could be a 25% owner and member.  Snell agreed to this decrease in his membership interest.

4

16.     Snell directed that Plaintiff Lynx would become the 25% owner and member of his percentage ownership of Ultimate Systems.  Snell is the sole beneficial owner of Lynx and the designated business representative of Lynx with respect to the business affairs of Ultimate Systems.

17.     In 2000 Defendants and Plaintiff formally created Ultimate Systems as an Ohio limited liability company.  A copy of the Operating Agreement of Ultimate Systems is attached as Exhibit A.

18.     Lynx contributed $100,000.00 as an interest-free loan to the start-up of Ultimate Systems.

19.     From the inception of Ultimate Systems in 2000, each Defendant and Plaintiff owned a 25% membership interest in Ultimate Systems.

20.     From the inception of Ultimate Systems in 2000, each Defendant was a member of Ultimate Systems and participated in the operation of the company.  Defendant Fanning was originally recruited to be an officer and employee of Ultimate Systems.  The members agreed that no other member would receive compensation for any work performed for the benefit of Ultimate Systems apart from approved distributions.

21.     Plaintiff's representative, Snell, does not reside in the United States and reasonably relied on Defendants' communications and financial statements regarding the company and its affairs.

22.     In or about 2000 to 2001,  as contemplated by Ted Horstman and Snell, MRI transferred and sold machinery and other assets that comprise the Banbury Line to RTH Processing and then ceased any competition for Banbury Line customers in the United States.

23.     MRI transferred and sold the Banbury Line machinery and other assets to RTH Processing and not directly to Ultimate Systems.  This was done because Defendant Ted Horstman represented to Snell that only RTH Processing -- an established company in the Toledo area -- could receive a loan from the Toledo-Lucas County Port Authority to support the Banbury Line acquisition, the acquisition of additional machinery and equipment to be used as part of Ultimate's business, and the general start-up of the Ultimate Systems business.

24.     Defendant Ted Horstman induced Snell to sell the Banbury Line machinery and other assets to RTH Processing, a company owned by Defendant Ted Horstman in which Snell would not own a direct interest, by representing that the Banbury Line business and assets would be held by RTH Processing in trust for Ultimate Systems until the Port Authority Loan and/or other loans used to help fund the start-up of the Ultimate/Banbury line of business were paid-off.

25.     Upon information and belief, Ultimate Systems was to benefit from the Port Authority loan, would repay the Port Authority loan, and did in fact repay the Port Authority loan.  The parties agreed that the Banbury Line would be transferred to Ultimate Systems upon repayment of the loan from the Toledo-Lucas County Port Authority.

26.     In addition to causing the sale of the MRI machinery to create the Banbury line, Snell also took steps to persuade various U.S. customers of MRI to become customers of Ultimate Systems and RTH.

27.     In 2010, without Plaintiff's or Snell's knowledge, the assets comprising the Banbury Line were transferred from RTH Processing to Banbury International LLC, an Ohio limited liability company wholly owned by Defendants Ted Horstman, Richard Horstman, and Fanning. Defendant Honigford, the chief financial officer and in-house general counsel of both Ultimate and RTH, formed Banbury International and facilitated the transfer of assets to it solely

for the purpose of excluding Plaintiff from the ownership of the Banbury Line, contrary to Defendant Ted Horstman's prior agreement and promises that the Banbury Line would be transferred to Ultimate once the loans were paid off. In approximately May 2014, Banbury International changed its name to Rubber Compounding LLC.

### Conduct of Ultimate Systems Business from 2000 to 2013

28.     From 2000 until the beginning of 2013, Ultimate Systems produced products pursuant to the original plans of the owners: the production of end-user rubberized products, and the production (through the Banbury Line) of colorized rubberized raw material.

29.     In the early years of its existence Defendants regularly provided quarterly financial statements and other information about Ultimate Systems and the Banbury Line to Lynx and Snell.

30.     At some point after the early years, Lynx and Snell stopped getting regular financial statements.  As distributions were being paid and other regular communications were occurring with Snell, and because there were no communications to Snell or Lynx about any unusual business issues or matters, Lynx did not pursue the failure of Defendants to supply regular financial statements.

31.     Soon after the inception of the Banbury Line, Ted Horstman told Snell that they could not afford to pay Lynx the two cents per pound agreed upon for colorized rubber sold to other U.S. customers.  In fact, Ted Horstman repeatedly told Snell that Ultimate Systems did not make money on the colorized rubber line, which Snell assumed was true and thus did not challenge this decision.

32.     From time to time from the inception of Ultimate Systems in 2000 to 2013, the owners discussed the potential of selling Ultimate Systems and the Banbury Line for a profit.

However, prior to the sale discussed below, Lynx and Snell were never informed that any parties had made any inquiries about acquiring the business, or any action had been taken by Ultimate Systems to market the business for sale.  Moreover, Snell was told over and over by Ted Horstman that "You'll get your share when the company is sold."

33.     In or around 2006, Ted Horstman informed Snell that the business could no longer purchase polyurethane from MRI because of the price.  At that time Defendants agreed that Lynx was entitled to an annual payment of $40,000 from Ultimate Systems, as compensation for Snell's promise not to compete with Ultimate Systems and the Banbury Line for U.S. customers.  Between 2006 and the present, however, only $80,000 was paid to Lynx for Snell's promise not to compete.

34.     Upon information and belief, Ultimate Systems entered into notes payable to DTR Equipment, Inc., of which Defendants Ted Horstman and Richard Horstman are owners; advanced or loaned funds to RTH Processing, of which Defendant Ted Horstman is an owner; and guaranteed a $1,671,396 note for DTR Real Estate, LLC ("DTR"), which is solely owned by Defendant Ted Horstman.  At no time during the history of Ultimate Systems or the Banbury Line was Plaintiff or Snell informed that Ultimate Systems had entered into these notes payable or provided these advances/loans or the guaranty, which was done for the benefit of Defendants and to the detriment of Plaintiff and Ultimate Systems.  These corporate actions represented a conflict of interest for Defendants and a breach of their fiduciary duties to Plaintiff, as Plaintiff never approved of them, and also violated the Operating Agreement because they were never formally approved by the members of Ultimate Systems as required by the Operating Agreement.

35.     Likewise, upon information and belief, in or about 2011 the lease payments paid by Ultimate Systems to DTR were significantly increased, even though there was no legitimate business justification for the increase.  At no time during the history of Ultimate Systems or the Banbury Line was Plaintiff or Snell informed that Ultimate Systems was paying increased rent to DTR, which was done for the benefit of Defendants and to the detriment of Plaintiff and Ultimate Systems.  Such an increase in lease payments to DTR also represented a conflict of interest for Defendant Ted Horstman and a breach of Defendants' fiduciary duties to Plaintiff, as Plaintiff never approved the increased lease payments to DTR, and also violated the Operating Agreement and was never formally approved by the members of Ultimate Systems.

36.     Upon information and belief, Ultimate Systems was paying an additional fee to Ted Horstman, even though David Fanning (and not Ted Horstman) was running the business and was the only employee approved by the Ultimate System members to receive compensation for his services.  At no time during the history of Ultimate Systems or the Banbury Line was Plaintiff or Snell informed that Ultimate Systems was paying an additional fee to Ted Horstman, which was solely for the benefit of Defendant Ted Horstman and to the detriment of Plaintiff and Ultimate Systems. Such a fee payment to Ted Horstman represented a conflict of interest for Defendant Ted Horstman and a breach by Defendants of their fiduciary duties to Plaintiff, as Plaintiff never approved the fee payment to Ted Horstman, which also violated the Operating Agreement and was never formally approved by the members of Ultimate Systems.

**Defendants Embark on Scheme to Sell Ultimate and the Banbury Line without Plaintiff's Knowledge or Participation.**

37.     On or about December 2012, a US competitor of Ultimate's (herein after "Competitor"), reached out to Ted Horstman expressing an interest in purchasing Ultimate, the Banbury Line, and RTH. In February 2013, Ted Horstman and Competitor signed a

Confidentiality Agreement concerning the sale of Ultimate, the Banbury Line, and RTH to Competitor.

38.     On April 15, 2013, Defendants Ted Horstman, Richard Horstman, and Fanning executed a Letter of Intent with Competitor for the sale of substantially all of the assets of Ultimate and Banbury International and the ownership of RTH to Competitor.  Defendants Ted Horstman, Richard Horstman, and Fanning each signed the Letter of Intent, falsely representing that they owned all of the ownership interests in the selling companies.

39.     Defendants never informed Plaintiff about anything concerning the potential sale of Ultimate, the Banbury Line, and RTH to Competitor.   In fact, in March 2013, when Competitor inquired as to Plaintiff's membership interest in Ultimate, Honigford informed Competitor that it did not need to concern itself with Plaintiff because "Ted [Horstman] intends to acquire [Plaintiff's] interest prior to closing any deal."

40.     Defendants and Competitor engaged in significant due diligence and negotiations concerning the potential sale of Ultimate and Banbury International to Competitor throughout 2013, with Defendants and Competitor making multiple site visits to each other's facilities and Defendants exchanging significant financial and business information to Competitor.

41.     Upon information and belief, Ted Horstman and/or the other Defendants had received communications in 2013 from at least one another entity interested in purchasing Ultimate, Banbury, and RTH, including from RB Rubber Inc., another competitor and subsidiary of Accella Performance Materials, Inc.

**The Squeeze-Out**

42.     In or about 2013, Snell became aware that he was receiving less and less information about the business of Ultimate Systems and the Banbury Line despite his written and verbal requests for information and updates.

43.     Despite this general refusal to provide corporate information to Plaintiff and Snell, Snell was told by Ted Horstman and David Fanning that Ultimate Systems had good sales in 2013 and record sales in October 2013.

44.     Starting in or about August 2013, Defendant Honigford began sending Snell email communications claiming that there were possible back taxes, penalties and interest that Lynx may owe.

45.     On August 6, 2013, Honigford sent an email to Snell informing him that Ultimate had not been "reporting" correctly since its inception, that "after consultation with Scott, tax counsel," he was required to inform Snell "of the possibility of findings including back taxes, penalties and interest for these errors," and that "the Service can, and likely would, look to" Snell and the other members "for contributions up to the total amount of taxes, penalty, and interest."

46.      In fact, however, there was no "Scott, tax counsel" and there was no tax liability owed by Ultimate or its members. At the same time Honigford was telling Snell that significant back taxes might be owed, Honigford and the Defendants were representing to Competitor, and later Accella in January 2014, that there were no pending tax issues and no investigations or inquiries by any tax authorities.

47.     On October 18, 2013, Snell sent an another email to Honigford requesting payment of the yearly non-competition fee to Lynx and asking that the Company provide various financials that had not yet been provided.  In response, on October 18, 2013, Honigford sent

11

Snell an email stating that he was talking with "our tax lawyer about settling with the initials" (presumably the IRS), that the amount required for settlement of the alleged tax issues might require the "remission" of "$250,000.00 in excess dividends" and asked how much lead time Snell would need to remit that amount.

48.     Snell challenged Honigford's suggestion in a follow-up email and asked for all of the underlying financial and related data and documentation to be sent to his accountant. Honigford stated in an email response that the "tax issue" was caused by Lynx's high tax bracket and foreign business entity status.  Honigford also replied that the company's accounting firm "now values each of your interests [in Ultimate] at about $670,000 notwithstanding the funds you've all received." Honigford did not ever provide the requested financials or arrange for the payment of the non-competition fee.  In fact, Honigford became defensive at the suggestion that he was not capable of handling the tax issues himself.

49.     In a subsequent email on October 18, 2013, Honigford stated:

This may not matter but I suggested to Ted that since you are not part of day to day management of the company, he should consider offering (sic) to buy you out to protect you from this mess.  Obviously he wasn't enthused about it and it certainly is not a "legal" obligation, but I pushed the idea that just as a "moral" obligation it might be the right thing to do considering your long friendship. After the explosion and his pointing out that not only would he be spending money but he would be taking on your share of the risk, he calmed down and discussed numbers.

I reiterated Luderman and Konst's valuation of 674000.00 for a 25% interest.  He did bring up the standard 20-33% lack of control discount, as he is aware of that from his and Dave's divorces, but we really didn't go a lot further.  I recall that you and i (sic) discussed this option last spring when it became clear that any additional dividends were pretty far away.  Not sure if this is something you have an interest in but I prepped the issue a little with Ted.  I think I can convince him to do it in that range with a release of claims.  Would at least get you an ROI and remove the uncertainty.   Your thoughts??  Obviously if we get to the formal offer stage this is moot.

50.     In other telephone conversations with Snell, Honigford also addressed scenarios that would require recapitalization of Ultimate Systems, such that if Snell did not support the recapitalization he could "get screwed" and end up with nothing.  Snell rejected the suggestion of having Lynx bought out and continued to insist that the relevant company data and documentation be sent to his accountant and attorney.  No data or documentation of the alleged tax issues and potential impact on Lynx was ever sent.

51.     Snell clearly and consistently refused each request to buy out Lynx as a 25% owner of Ultimate Systems and the Banbury Line.

52.     Upon information and belief, the assertions by Honigford and Ted Horstman that there were significant taxes and related amounts that Lynx may owe were false.

53.     Upon information and belief, Defendants and Honigford invented and misrepresented the alleged significant tax liability as part of the scheme to cause Plaintiff to sell its 25% ownership interest in Ultimate Systems to Defendants Ted Horstman, Richard Horstman, and Fanning, for the purpose of squeezing-out and depriving Lynx of its rightful share of the anticipated profits from the eventual sale of Ultimate Systems and the Banbury Line, then in the works.

54.     In or about the fall of 2013, Snell learned through a third-party that Competitor was exploring the purchase of Ultimate Systems and the Banbury Line and that an offer of approximately $10 million dollars and shares of the buyer had been made to Defendants.  Again, Snell never learned anything about the Competitor's offer to purchase Ultimate and the Banbury Line from any of the Defendants or from Honigford.

13

55.     In or about October 23, 2013, Snell and Ted Horstman met at a trade show in Cologne, Germany, at which time Snell asked Horstman to reinstate Plaintiff's $40,000 annual payments.  Ted Horstman promised this would happen "as soon as cash flow allows."

56.     At this meeting Snell also asked Ted Horstman to tell him about all of the developments in the Ultimate Systems business and anything of importance that he should know about the business.  In response, Horstman lied – stating that the business was proceeding as usual and mentioned the alleged tax liability issue and other routine business matters.  Ted Horstman never mentioned anything regarding a sale or acquisition, an offer or interest from any third party regarding the purchase of Ultimate Systems and the Banbury Line, anything about a plan to restructure the company and merge it with another company to eliminate Lynx as a member, or about an ongoing valuation of the company for purposes of an acquisition of Lynx's interest.

57.     In this meeting Ted Horstman intentionally omitted and concealed material information about the then-ongoing sale and acquisition process of Ultimate Systems and the Banbury Line, and Defendants' plan, formed with the assistance of Honigford, to eliminate Plaintiff as a member by merging Ultimate into a new Ohio limited liability company wholly owned by Defendants Ted Horstman, Richard Horstman, and Fanning, and paying Lynx the purported fair market value of its membership interest in Ultimate.

58.     As part of the Defendant's scheme to eliminate Plaintiff as a member, on November 4, 2013, Honigford, on behalf of the other Defendants, retained the CPA firm Sielschott, Walsh, Keifer, & Regula, Inc. ("SWKR") to perform "a valuation" of 25% of Ultimate under the pretense that Defendant's Ted Horstman, Richard Horstman, and David Fanning were buying out Lynx's minority share in Ultimate.  While acting on behalf of the other

14

Defendants, Honigford provided all of the information to SWKR for purposes of the valuation and was the sole person to communicate with SWKR.  In so doing, Honigford provided materially false and misleading information to SWKR for purposes of artificially lowering the valuation results including but not limited to: (1) arbitrarily imposing a year-end 2012 valuation date, even though more current financials indicated 2013 would be a significantly more profitable year; and (2) failing to inform SWKR that Defendants had received bona fide offers to purchase Ultimate.

59.     Under pressure from Honigford to perform the valuation as soon as possible, the valuation was completed by SWKR on December 7, 2013.

60.     In 2013 there were no meetings of the members.  In 2013 there was no notice of a meeting, or notice of approval of any corporate action without a meeting given to Plaintiff or to Snell as Plaintiff's representative, as required for actions by members in Section 5.4 of the Ultimate Systems Operating Agreement.

61.     Ohio law and Section 8.3 of the Operating Agreement provides that any offer to purchase any member's interest must be communicated in writing to the company and all of the other members, such as to Plaintiff and its representative, Snell.

62.     Contrary to the requirements of Ohio law and the Operating Agreement, there was no communication – in writing or otherwise – to Snell or Plaintiff by Defendants or any Ultimate Systems representative about a sale or acquisition process, an offer or interest from any third party regarding the purchase of Ultimate Systems and the Banbury Line, about a plan to restructure the company and merge it with another company to eliminate Plaintiff as a member, or about an ongoing valuation of the company for purposes of an acquisition of a member's interest.

63.     Defendants intentionally omitted, misrepresented and concealed information about the 2013 sale and acquisition process and their plan to eliminate Plaintiff as a member.

64.     On November 21, 2013, Snell emailed Ted Horstman and requested a members meeting on December 11, 2013.  Snell stated "Let's sort this before it goes too far, no (sic) of us I'm sure want that…we can discuss you getting rid of me which is what you want."  Honigford replied on behalf of Ted Horstman in a November 22, 2013 email stating:

> Vince, Ted has forwarded this message to me for response as he is on the road and will be for the next couple weeks, and wasn't up to date on our litigation schedule.  We will be in trial the end of the week from the 11th to the 13th, then I have hearings early the following week and Ted is gone again.  The next week is Christmas.  Looks like right after the holidays is the first real chance to have everybody together.  I will be in touch.

65.     In this email and a subsequent telephone conversation, Honigford intentionally misrepresented to Snell that a members meeting could not occur before "after the holidays" and intentionally omitted all information about the ongoing secret valuation and merger process designed to eliminate Plaintiff as a member of Ultimate Systems.

66.     Despite claiming that he was unable to arrange a meeting of the members because "We will be in trial the end of the week from the 11th to the 13th" of December, Honigford drafted a letter dated December 12, 2013 purporting to terminate Lynx as a member of Ultimate Systems.  In that letter to Lynx – dated December 12, 2013 on letterhead from "Robert J. Honigford, Attorney at Law" – Honigford stated:

    a.  That he represents RDT Manufacturing LLC ("RDT") as its Corporate Counsel;

    b.  That as of the close of business December 13, 2013, his client RDT became the successor by merger to Ultimate Systems;

    c.  That Ultimate Systems was appraised by a certified valuation expert, Robert E. Sielschott, 711 Dean Ave., Lima, Ohio 45804, and that it "has been determined by the valuation expert that a one quarter interest in Ultimate Systems LLC., has a fair market value of $525,000.00 in U.S. Funds;"

16

    d.   That a certified valuation report by Sielschott, Walsh, Keifer, & Regula, Inc. dated December 14, 2013 ("Valuation Report") was enclosed; and

    e.   "Again with keeping with the laws of the State of Ohio regarding Limited Liability Companies. (sic) Enclosed, please find my escrow check in the amount of $525,000 in full and final payment of your interest in the acquired Limited Liability Company, Ultimate Systems[.]"

67.    This December 12, 2013 letter to Lynx was mailed to its St. Lucia address. Neither Honigford nor any Defendant communicated anything about the matters set forth in this letter to Lynx's trustee, Mikkel Lind, or to Vince Snell, even though their telephone numbers and emails were known to Honigford and the Defendants.

68.    The Ultimate Systems Operating Agreement does not permit a "merger" without the unanimous consent of the members, which was not obtained.  Under Ohio Revised Code § 1705.36(F) a merger of a limited liability company requires the approval of all the members thereof.  Further, Ohio Revised Code § 1705.36(E) requires that all members of a domestic limited liability company be given written notice of any meeting when the meeting or action is to adopt or approve an agreement of merger.  Further, such notice shall be given not less than seven days before the date of the meeting and shall be accompanied by a copy or summary of the material provisions of the agreement of merger.  None of the notice requirements required by Ohio Revised Code 1705.36(E) were satisfied by the Defendants prior to the alleged merger of Ultimate Systems into RDT.

69.    In addition, an Ultimate Systems member can only be involuntarily terminated upon the occurrence of an "Option Event."  An Option Event is defined at Section 2.8 of the Agreement, and provides only three specific events, none of which occurred prior to the purported termination of Plaintiff's interest in Ultimate Systems.

70.     Defendant Honigford orchestrated the scheme and drafted all of the documents used to effectuate the merger of Ultimate into RDT and to effectuate the squeeze-out of Plaintiff despite knowing that such actions were taken contrary to Ohio law and the Operating Agreement.

71.     Upon receipt of the December 12, 2013 communication from Honigford, Plaintiff requested information from SWKR regarding their valuation, and requested information from Honigford about the merger and valuation.   Neither SWKR nor Honigford responded to Plaintiff's questions and information requests.

72.     The Valuation Report contains material errors and omissions that materially understated the fair market value of Ultimate Systems and the Banbury Line, including but not limited to the following:

   a.  There is no valuation of the Banbury Line as part of the Ultimate Services valuation;

   b.  There is no inclusion or consideration of any offers received or plan for sale of the Ultimate Systems and Banbury Line businesses, including that contained in the April 2013 Letter of Intent with Competitor or those that ultimately resulted in the sale of Ultimate Systems and Banbury to Accella, which was announced in May 2014;

   c.  Despite not being completed until December 14, 2013, the Valuation Report improperly values the business as of December 31, 2012;

   d.  The Valuation Report used management projections for 2013 despite the availability of actual financial results through December 2013;

   e.  Five-year management-provided financial forecasts of negative, flat and little growth relied upon in the Valuation Report are unsupported by prior financial performance and directly contrary to the projections supplied by the Defendants in their negotiations with the third-party purchases at or near the same time;

   f.  Inflation of expenses (and undervaluation of income) due to inappropriate charging of personal expenses to the company and inflated, unapproved related party rents, guaranties and other payments benefiting Defendants; and

g. The equity was valued with a discount applied for control restrictions and a lack of marketability, when there was no factual basis for a discount as the equity was not being valued for sale to an unrelated third party.

73.    Therefore Defendants knew that the $525,000 equity valuation was grossly deceptive and materially wrong and undervalued.

74.    On May 1, 2014, Accella Performance Materials announced its acquisition of substantially all of the assets of RDT (the former Ultimate Systems), Banbury International, and RTH Processing. This announcement quotes, "Ted Horstman, President of RTH and RDT said, 'We are excited about the Accella partnership and merger of the rubber companies which positions us to better serve our customers globally and to expand our product offerings into existing and new markets.'"

75.    Lynx has not received a 25% pro rata share of the consideration or benefits provided by Accella Performance Materials for the acquisition of substantially all of the assets of RDT, Banbury, and RTH. Lynx would have received a 25% pro rata share of such consideration and/or benefits but for the wrongful conduct of Defendants that resulted in the illegal squeeze-out of Lynx from its ownership of Ultimate and the Banbury Line.

### Count One – Breach of Fiduciary Duties
### (Against Defendants Ted Horstman, Richard Horstman, and Fanning)

76.    Plaintiff re-alleges and incorporates by reference paragraphs 1-63 of this Complaint as if fully rewritten herein.

77.    Ultimate Systems was a closely-held Ohio limited liability corporation with four members. Under Ohio law, Defendants Ted Horstman, Richard Horstman, and Fanning each owed strict fiduciary duties to Plaintiff that include (but are not limited to) duties of loyalty, fairness, full disclosure, utmost candor and honesty, to refrain from self-dealing and conflicts of interest and to act in good faith and for legitimate business purposes.

78.     Under Ohio law, Defendants Ted Horstman, Richard Horstman, and Fanning were also each required to refrain from misappropriating any corporate opportunities, or from using their position as majority members to act in bad faith and for the wrongful purpose of disadvantaging Plaintiff, a member with a minority interest, and keep it from an equal chance to benefit from lucrative corporate opportunities.

79.     Contrary to the strict fiduciary duties they owed, Defendants Ted Horstman, Richard Horstman, and Fanning breached their fiduciary duties to the Plaintiff and violated Plaintiff's membership interest rights under Ohio law by engaging in the bad faith acts and omissions set forth above, including but not limited to:

   a.  Those acts which benefited Defendants and Defendants' other businesses  during the operation of Ultimate Systems to the detriment of Ultimate Systems and Plaintiff;

   b.  Misrepresenting business matters in an attempt to induce Plaintiff to sell its interest for an unfair and grossly undervalued amount;

   c.  Concealing and failing to disclose material and relevant information that Ohio law required them to provide to Plaintiff, including but not limited to  information about Defendants' harmful actions, about Ultimate Systems' financials and corporate opportunities, and about illegal acts taken to obtain an undervaluation of Ultimate Systems and to attempt to merge Ultimate Systems into RDT;

   d.  Improperly and illegally terminating Plaintiff's interest in Ultimate Systems through an invalid merger for the purpose of squeezing out Plaintiff so that the subsequent lucrative sale of the company would greatly enrich and profit only Defendants and provide only a nominal payment to Plaintiff for its membership interest;

   e.  Directing and assisting in the deceptive, gross undervaluation of Ultimate Systems in order to grossly underpay Plaintiff for its membership interest; and

   f.  Failing to approve payments owed to Plaintiff for Snell's continued performance of his agreement not to compete with Ultimate Systems' Banbury Line business.

80.     As a direct and proximate result of these Defendants' breach of their fiduciary duties, Plaintiff has suffered damages in an amount to be determined at trial, which upon

information and belief exceed $10 million, plus pre- and post-judgment interest, punitive damages, disgorgement, costs, expenses, attorney fees, and other monetary and equitable relief as may be appropriate.

81.    As a further direct and proximate result of these Defendants' breach of their fiduciary duties, Plaintiff is entitled to a constructive trust over all of the benefits and amounts received by each Defendant from Ultimate Systems, Accella Performance Materials, RDT and RTH to date.

82.    As a further direct and proximate result of these Defendants' breach of their fiduciary duties, Plaintiff is entitled to an accounting of all of the income, expenses and distributions of Ultimate Systems.

**Count Two – Conversion**
**(Against Defendants Ted Horstman, Richard Horstman, and Fanning)**

83.    Plaintiff re-alleges and incorporates by reference paragraphs 1-70 of this Complaint as if fully rewritten herein.

84.    Defendants Ted Horstman, Richard Horstman, and Fanning individually and/or collectively through his actions breached a duty to Plaintiff, including but not limited to the duty of good faith and fair dealing, when he wrongfully acquired and exercised dominion over Plaintiff's full membership interest in Ultimate Systems against the will of Plaintiff, and in bad faith withheld and disposed of Plaintiff's membership interest in a manner inconsistent with Plaintiff's rights.

85.    Plaintiff did not consent to these Defendants' seizure and dispossession of Plaintiff's membership interest or to Defendants' deceptive, gross undervaluation of its membership interest.

86.     Each of these Defendants thus unlawfully converted Plaintiff's membership interest.

87.     As a direct and proximate result of each of these Defendant's act of conversion, Plaintiff has suffered damages in an amount to be determined at trial, which upon information and belief exceed $10 million, plus pre- and post-judgment interest, punitive damages, disgorgement, costs, expenses, attorney fees, and other monetary and equitable relief as may be appropriate.

### Count Three – Breach of Contract
### (Against Defendants Ted Horstman, Richard Horstman, and Fanning)

88.     Plaintiff re-alleges and incorporates by reference paragraphs 1-75 of this Complaint as if fully rewritten herein.

89.     Defendants Ted Horstman, Richard Horstman, and Fanning individually and/or collectively through his actions breached multiple provisions of the Ultimate Systems Operating Agreement, which breaches include but are not limited to: failure to provide information; failure to protect the Company's business and assets; violations of limitations on authority of Members; failure of notifications to Plaintiff; purportedly merging the Company; and improperly invoking and then paying less than the fair market value of Plaintiff's membership interest.

90.     As a direct and proximate result of each of these Defendant's acts of breach, Plaintiff has suffered damages in an amount to be determined at trial, which upon information and belief exceed $10 million, plus pre- and post-judgment interest, compensatory damages, costs, expenses, attorney fees, and other relief as may be appropriate.

### Count Four – Civil Conspiracy
### (Against all Defendants)

91.     Plaintiff re-alleges and incorporates by reference paragraphs 1-90 of this Complaint as if fully rewritten herein.

92.     Defendant Honigford knowingly and maliciously conspired with and provided necessary and material assistance to Defendants Ted Horstman, Richard Horstman, and Fanning to commit unlawful acts including but not limited to those set forth above, *i.e.*, breach of fiduciary duties, conversion, and breach of contract.

93.     The Defendants' conspired and acted with the purpose and intent to harm Plaintiff including to deprive Plaintiff of the benefits of its membership interest in Ultimate.

94.     As a direct and proximate result of the Defendants' conspiracy and underlying unlawful acts, Plaintiff has suffered damages in an amount to be determined at trial, which upon information and belief exceed $10 million, plus pre- and post-judgment interest, compensatory damages, costs, expenses, attorney fees, and other relief as may be appropriate.

**WHEREFORE,** Plaintiff Lynx Services Limited demands judgment as follows:

a.  Damages in an amount to be proven at trial against Defendants, jointly and severally, which upon information and belief exceed $10 million;

b.  Ordering a constructive trust in Plaintiff's favor over all benefits received by Defendants to date;

c.  Ordering an accounting of all of the income, expenses and distributions of Ultimate Systems, including the Banbury Line;

d.  Awarding Plaintiff a disgorgement of all Defendants' ill-gotten gains;

e.  Awarding Plaintiff punitive damages;

f.  Awarding Plaintiff pre-judgment and post-judgment interest;

g.  Awarding Plaintiff its cost of suit, including its reasonable attorneys' fees.

h.  Awarding such other and further monetary and equitable relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Julia A. Davis*
James E. Arnold (Ohio Bar # 0037712)
Julia A. Davis (Ohio Bar # 0031266)
Gerhardt A. Gosnell II (Ohio Bar # 0064919)

JAMES E. ARNOLD & ASSOCIATES, LPA
115 West Main Street, 4th Floor
Columbus, Ohio 43215
Telephone:     (614) 460-1600
Fax:    (614) 469-1006
jarnold@arnlaw.com
jdavis@arnlaw.com
ggosnell@arnlaw.com

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

*/s/ Julia A. Davis*

24

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing ***Amended Complaint*** was filed electronically on this 14th day of June 2015. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/Julia A. Davis*
Julia A. Davis
