## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Lynx Services, Ltd.,                                    Case No. 3:14CV1967

                Plaintiff,

     v.

                                         **ORDER**
Robert T. Horstman, et al.,

                Defendants.

This is a case about alleged breaches of fiduciary and other duties between members and officers of Ultimate Systems, Ltd. (Ultimate Systems), an Ohio limited liability company.

Plaintiff Lynx Services, Ltd. (Lynx) alleges defendant LLC members Ted Horstman, Richard Horstman and David Fanning, along with Robert J. Honigford, the chief financial officer and in-house general counsel of the LLC, unlawfully squeezed Lynx out of the company to prevent it from receiving its share of profits from the sale of the LLC's assets.

Defendants deny that allegation, and counter that Lynx defrauded and breached its fiduciary duty to the LLC by competing with it despite agreeing and receiving payments not to do so.

Jurisdiction is proper under 28 U.S.C. § 1332.

Pending are: 1) defendants' motion for leave to file an amended answer and counterclaims (Docs. 49, 52); and 2) plaintiff's motion to dismiss defendants' counterclaims (Docs. 38, 51). For the reasons discussed below, I deny defendants' motion and grant plaintiff's motion.

**Background**

According to the complaint, in the 1990s RTH Processing, Inc. (RTH), an Ohio company, bought scrap rubber and colored granulated sheeting to produce and sell granulated rubber material to customers in the United States. (Doc. 28 ¶ 10). Prior to 2000, RTH did not itself manufacture colorized rubber material. (*Id.*). Defendants Ted Horstman and Richard Horstman were and remain the sole owners of RTH. (*Id.*). Ted Horstman was President of RTH at all times relevant to this dispute. (*Id.*).

At the same time, Vincent Snell, a citizen of the United Kingdom, owned a United Kingdom company called Millennium Rubber International (MRI), which supplied colorized rubber material and polyurethane to customers in the United Kingdom, the United States, and other countries. (*Id.* ¶ 11).

Sometime during 2000, Ted Horstman and Snell devised a plan to combine parts of their respective rubber material businesses into a new Ohio company to produce colorized rubber material and end-user products such as rubber flooring. (*Id.* ¶ 13). This new business would eventually become known as Ultimate Systems. (*Id.*).

The business combination plan to form Ultimate Systems had five main elements:

1. MRI would sell rubber mixing equipment and other assets to Ultimate Systems for a production line in Ohio to manufacture colorized rubber material (the "Banbury Line");

2. MRI would not compete with Ultimate Systems for United States customers in the future; this included the Banbury Line;

3. RTH would supply its existing product to Ultimate Systems as its new primary customer;

2

      4.      Snell would receive two cents for each pound of colorized rubber the Banbury Line sold to new customers; and

      5.      Snell would be the owner, directly or indirectly, of thirty-three percent of Ultimate Systems, with Ted Horstman and David Fanning as the other two members.

(*Id.* ¶ 14).

Eventually, Ted Horstman, to enable his brother Richard Horstman to be a twenty-five percent owner and member, asked Snell to accept a reduced membership interest of twenty-five percent. (*Id.* ¶ 15). Snell agreed. (*Id.*).

Snell caused plaintiff Lynx to become the owner of his percentage ownership and membership in Ultimate Systems. (*Id.* ¶ 16). Relative to the business affairs of Ultimate Systems, Snell is the sole beneficial owner and designated business representative of Lynx. (*Id.*).

Defendants and Lynx created Ultimate Systems as an Ohio LLC in 2000. (*Id.* ¶ 17). Lynx contributed $100,000 as a short term, interest-free loan to the start-up of Ultimate Systems.[1] (*Id.* ¶ 18). Lynx, Ted Horstman, Richard Horstman and David Fanning each owned twenty-five percent shares of Ultimate Systems. (*Id.* ¶ 19).

Each defendant participated in the operation of Ultimate Systems. (*Id.* ¶ 20). Fanning became an officer and employee, receiving compensation for those roles. (*Id.*). The other members agreed not to receive compensation for work they did for Ultimate Systems apart from approved distributions. (*Id.*).

In late 2000 or early 2001, as Ted Horstman and Snell had contemplated, MRI transferred and sold machinery and other assets that comprise the Banbury Line to RTH. (*Id.* ¶ 22). Ted

---

[1] Defendants allege the loan was for $300,000. (Doc. 49-1 at 15 ¶ 17).

Horstman and Snell then stopped competing for Banbury Line customers in the United States.[2] (*Id.*).

MRI transferred and sold the Banbury Line machinery and other assets to RTH and not directly to Ultimate Systems. (*Id.* ¶ 23). MRI did so because Ted Horstman represented to Snell that RTH – an established company in the Toledo area – could receive a loan from the Toledo-Lucas County Port Authority to support business start-up and acquisition of the Banbury Line and additional machinery.[3] (*Id.*). The parties agreed that Ultimate Systems would repay the loan and RTH thereupon would transfer the Banbury Line to Ultimate Systems.[4] (*Id.* ¶¶ 24-25).

From 2000 until the beginning of 2013, Ultimate Systems produced products pursuant to the owners' original plans: the production of end-user rubberized products, and the production (through the Banbury Line) of colorized rubberized raw material. (*Id.* ¶ 28).

Defendants initially provided quarterly financial statements and other information about Ultimate Systems and the Banbury Line to Lynx and Snell. (*Id.* ¶ 29). In time, however, Lynx and Snell stopped getting regular financial statements. (*Id.* ¶ 30).

Soon after the inception of the Banbury Line, Ted Horstman told Snell that paying Lynx, as the parties had agreed, two cents per pound for colorized rubber sold to other United States customers was no longer possible. (*Id.* ¶ 31). Ted Horstman repeatedly told Snell that Ultimate

---

[2] Defendants allege Lynx knowingly sold Ultimate Systems substandard and/or defective machinery. (Doc. 49-1 at 11-12 ¶¶ 100-01).

[3] Defendants allege that Richard Horstman cross-collateralized "his equipment" from RTH to obtain the loan. (Doc. 49-1 at 15 ¶ 14).

[4] In 2010, RTH transferred the assets comprising the Banbury Line to Banbury International LLC, an Ohio LLC wholly owned by Ted Horstman, Richard Horstman, and Fanning. Honigford formed Banbury International LLC and facilitated the transfer of assets to it. In approximately May 2014, Banbury International LLC changed its name to Rubber Compounding LLC.

4

Systems did not make money on the colorized rubber line. (*Id.*). Snell accepted these representations as true. (*Id.*).

From time to time between 2000 and 2013, the parties discussed the possibility of selling Ultimate Systems and the Banbury Line for a profit. (*Id.* ¶ 32). However, no one ever told Lynx or Snell that any potential buyers had made any inquiries about acquiring the business, or that defendants had marketed it for sale. (*Id.*). Defendants simply reassured Snell that he would get his share of any sales proceeds. (*Id.*).

In approximately 2006, Ted Horstman informed Snell that the business would, due to cost concerns, no longer purchase polyurethane from MRI. (*Id.* ¶ 33). Around that time, Ultimate Systems agreed to pay Lynx $40,000 per year so that Snell would not compete with Ultimate Systems and the Banbury Line for United States customers. (*Id.*). Between 2006 and the date of the complaint, however, Lynx had received just $80,000 for Snell's promise not to compete.[5] (*Id.*).

Sometime after 2006, Ultimate Systems signed notes payable to DTR Equipment, Inc., which Ted Horstman and Richard Horstman own; advanced or loaned funds to RTH; and guaranteed a $1,671,396 note for DTR Real Estate, LLC (DTR), Ultimate Systems' lessor, and owned solely by Ted Horstman. (*Id.* ¶ 34). No one told Lynx or Snell that Ultimate Systems had signed these notes, provided these advances/loans or made the guaranty. (*Id.*).

Likewise, sometime in 2011, the Ultimate Systems lease payments to DTR increased significantly. (*Id.* ¶ 35). Once again, no one informed Lynx or Snell about the change (*Id.*).

---

[5] Defendants allege that Snell in fact "never ceased competing with RTH. Instead of continuing to manufacture his own product, he sought to circumvent the agreement by purchasing product from China and sold that to the detriment of RTH." (Doc. 49-1 at 16-17 ¶ 26). Defendants further allege "Snell conducted at least $1,000,000 of sales each year for his own company with products similar to that made by RTH in breach of his agreement with RTH." (*Id.* at 17 ¶ 27).

Moreover, Ultimate Systems was paying an additional fee to Ted Horstman, even though David Fanning was running the business and was the only employee whom the Ultimate Systems members had agreed to compensate. (*Id.* ¶ 36). Lynx and Snell did not know about the fee payment. (*Id.*).

In December 2012, a United States competitor (Competitor),[6] contacted Ted Horstman expressing an interest in purchasing Ultimate Systems, the Banbury Line and RTH. (*Id.* ¶ 37). In February 2013, Ted Horstman and Competitor signed a confidentiality agreement regarding the possible sale. (*Id.*). On April 15, 2013, Ted Horstman, Richard Horstman, and Fanning executed a Letter of Intent with Competitor (*Id.* ¶ 38). No one advised Lynx or Snell about the potential sale. (*Id.* ¶ 39).

Sometime in 2013, Snell became concerned he was receiving insufficient information about the financial performance of Ultimate Systems and the Banbury Line. (*Id.* ¶ 42). After Snell had made written and verbal requests for information and updates, Ted Horstman and Fanning told Snell that Ultimate Systems had good sales in 2013 and record sales in October 2013. (*Id.* ¶ 43).

Starting around August 2013, however, Honigford began emailing Snell claiming that Ultimate Systems had not been "reporting" correctly since its inception, that "after consultation with Scott, tax counsel," he had to inform Snell "of the possibility of findings including back taxes, penalties and interest for these errors," and that "the Service can, and likely would, look to" Snell and the other members "for contributions up to the total amount of taxes, penalty, and interest." (*Id.* ¶ 45).

---

[6] Plaintiff does not identify this competitor.

6

On October 18, 2013, Snell emailed Honigford seeking payment to Lynx of the yearly non-competition fee. He also asked Ultimate Systems to provide various financials that it had yet to provide. (*Id.* ¶ 47). By return email later that day, Honigford told Snell that the "tax issue" resulted from Lynx's high tax bracket and foreign business entity status. (*Id.* ¶ 48). Honigford also stated that Ultimate Systems' accounting firm "now values each of your interests [in Ultimate Systems] at about $670,000 notwithstanding the funds you've all received." (*Id.*). Honigford never provided the requested financials or arranged for payment of the non-competition fee. (*Id.*).

In yet another email to Snell that day, Honigford wrote:

> This may not matter but I suggested to Ted that since you are not part of day to day management of the company, he should consider offering (sic) to buy you out to protect you from this mess. Obviously he wasn't enthused about it and it certainly is not a "legal" obligation, but I pushed the idea that just as a "moral" obligation it might be the right thing to do considering your long friendship. After the explosion and his pointing out that not only would he be spending money but he would be taking on your share of the risk, he calmed down and discussed numbers.
>
> I reiterated Luderman and Konst's valuation of 674,000.00 for a 25% interest. He did bring up the standard 20-33% lack of control discount, as he is aware of that from his and Dave's divorces, but we really didn't go a lot further. I recall that you and i (sic) discussed this option last spring when it became clear that any additional dividends were pretty far away. Not sure if this is something you have an interest in but I prepped the issue a little with Ted. I think I can convince him to do it in that range with a release of claims. Would at least get you an ROI and remove the uncertainty. Your thoughts?? Obviously if we get to the formal offer stage this is moot.

(*Id.* ¶ 49).

In other telephone conversations with Snell, Honigford also addressed scenarios that would require recapitalization of Ultimate Systems, such that if Snell did not support the recapitalization

he could "get screwed" and end up with nothing. (*Id.* ¶ 50). Snell rejected the suggestion of having Lynx bought out and continued to insist that the relevant company data and documentation be sent to his accountant and attorney. (*Id.*). He never received that data or documentation. (*Id.*).

During the Fall of 2013, Snell learned through a third-party that Competitor had offered approximately ten million dollars and shares of its stock to purchase Ultimate Systems and the Banbury Line. (*Id.* ¶ 54). Again, Snell never learned about the Competitor's offer from defendants. (*Id.*).

On October 23, 2013, Snell and Ted Horstman met at a trade show in Germany, at which time Snell asked Horstman to reinstate Lynx's $40,000 annual payments. (*Id.* ¶ 55). Ted Horstman promised that would happen "as soon as cash flow allows." (*Id.*).

At the meeting, Snell also asked Ted Horstman to tell him about any important developments in the Ultimate Systems business. (*Id.* ¶ 56). Horstman responded that the business was proceeding as usual and mentioned the alleged tax liability issue and some routine business matters. (*Id.*). He never mentioned a possible sale of the Ultimate Systems, an offer or interest from a third party to purchase Ultimate Systems and the Banbury Line, or a plan to restructure Ultimate Systems and merge it with another company. (*Id.*).

On November 4, 2013, Honigford, on behalf of the other defendants, retained the CPA firm Sielschott, Walsh, Keifer & Regula, Inc. (SWKR) to perform "a valuation" of twenty-five percent of Ultimate Systems. Honigford did so under the pretense that Ted Horstman, Richard Horstman and Fanning were buying out Lynx's minority share in Ultimate Systems. (*Id.* ¶ 58). Honigford provided information to SWKR for purposes of the valuation, but did not inform SWKR that defendants had

8

received offers to purchase Ultimate Systems. (*Id.*). SWKR completed the valuation on December 7, 2013. (*Id.* ¶ 59).

On November 21, 2013, Snell emailed Ted Horstman requesting a members meeting on December 11, 2013. (*Id.* ¶ 64). Snell stated "[l]et's sort this before it goes too far, no (sic) of us I'm sure want that . . . we can discuss you getting rid of me which is what you want." (*Id.*). Honigford replied on behalf of Ted Horstman in a November 22, 2013 email stating:

> Vince, Ted has forwarded this message to me for response as he is on the road and will be for the next couple weeks, and wasn't up to date on our litigation schedule. We will be in trial the end of the week from the 11th to the 13th, then I have hearings early the following week and Ted is gone again. The next week is Christmas. Looks like right after the holidays is the first real chance to have everybody together. I will be in touch.

(*Id.* ¶ 64).

On December 12, 2013, Honigford drafted a letter purporting to terminate Lynx as a member of Ultimate Systems. (*Id.* ¶ 66). In that letter, Honigford stated:

> 1) That he represented RDT Manufacturing LLC (RDT) as its Corporate Counsel;
>
> 2) That as of the close of business December 13, 2013, his client RDT would become the successor by merger to Ultimate Systems;
>
> 3) That Ultimate Systems was appraised by a certified valuation expert, and that it "has been determined by the valuation expert that a one quarter interest in Ultimate Systems LLC., has a fair market value of $525,000.00 in U.S. Funds;"
>
> 4) That a certified valuation report by SWKR dated December 14, 2013 ("Valuation Report") was enclosed; and
>
> 5) "Again with keeping with the laws of the State of Ohio regarding Limited Liability Companies. (sic) Enclosed, please find my escrow check in the amount of $525,000 in full and final payment of your

9

interest in the acquired Limited Liability Company, Ultimate Systems[.]"

(*Id.*).

Upon receipt of the December 12, 2013 letter from Honigford, Lynx requested information from SWKR regarding their valuation, and requested information from Honigford about the merger and valuation. (*Id.* ¶ 71). Neither SWKR nor Honigford responded to Lynx's questions and information requests. (*Id.*). Lynx alleges that because of various material errors and omissions in the Valuation Report, the valuation of Lynx's interest in Ultimate Systems was wrong. (*Id.* ¶¶ 72-73).

On May 1, 2014, Accella Performance Materials (Acella) announced its acquisition of substantially all of the assets of RDT, Banbury International and RTH. (*Id.* ¶ 74). According to the announcement, "Ted Horstman, President of RTH and RDT said, 'We are excited about the Accella partnership and merger of the rubber companies which positions us to better serve our customers globally and to expand our product offerings into existing and new markets.'" (*Id.*). Lynx did not receive a share of the proceeds from the Acella deal. (*Id.* ¶ 75).

Lynx brought this action on September 4, 2014. (Doc. 1). It later filed an amended complaint on July 14, 2015, asserting claims for: 1) breach of fiduciary duties; 2) conversion; 3) breach of contract; and 4) civil conspiracy. (Doc. 28).

Defendants filed an answer to the amended complaint on August 28, 2015. (Doc. 35). In it, they asserted counterclaims for: 1) "piercing the corporate veil;" 2) breach of fiduciary duties; 3) fraud; 4) breach of contract; and 5) unjust enrichment.[7] (*Id.*). The gravamen of defendants'

---

[7] Defendants have withdrawn their breach of contract and unjust enrichment counterclaims. (Doc. 50 at 5).

counterclaims was that Snell sold them mechanically unsound equipment and then reneged on his agreement not to compete with Ultimate Systems. (*Id.*).

Lynx moved to dismiss the counterclaims, arguing: 1) statutes of limitations barred claims based on the equipment sales to RTH; 2) defendants cannot seek to enforce their rights under a contract and concurrently assert fraud claims (which challenge the validity of the contract); and 3) defendants have no standing to assert breach of contract or unjust enrichment claims on behalf of RTH. (Doc. 38).

In response, defendants now move for leave to amend their answer and counterclaims. (Doc. 49). In the proposed filing, defendants: 1) recast their claims based on Snell's sale of equipment to RTH as two new affirmative defenses (Doc. 49-1 at 11-12 ¶¶ 100-01); and 2) assert two counterclaims – one for breach of fiduciary duty, the other for fraud – based on Snell's alleged violation of his non-competition agreement.[8] (*Id.* at 17-22 ¶¶ 32-53).

Lynx opposes defendants' motion and has renewed its motion to dismiss. (Doc. 51).

## Standard of Review

Under Fed. R. Civ. P. 15(a)(2), I should give plaintiffs leave to amend their pleading if "justice so requires." When a party decides "to advance a new claim as a result of . . . discovery," Rule 15(a) provides for "liberal amendment to the complaint." *Tucker v. Union of Needletrades, Indus. & Textile Emp.*, 407 F.3d 784, 788 (6th Cir. 2005).

---

[8] Defendants allege that Snell's various companies were his alter egos, and reason that it is therefore appropriate to pierce the corporate veil and hold him personally liable for counterclaims against Lynx. (Doc. 35 ¶¶ 46-49). Because I find defendants' proposed counterclaims to be futile on other grounds, I need not decide this issue. For the purposes of the instant motions, however, I will treat Snell and Lynx as the same actor.

11

"Nevertheless, leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile.'" *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011) (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)). A court may deny a motion for leave to amend for futility if the amendment could not withstand a motion to dismiss. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010); *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 767 (6th Cir. 2005).

The Federal Rules provide for dismissal based on a plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion tests whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988). "When evaluating a motion to dismiss brought pursuant to rule 12(b)(6), the factual allegations in the complaint must be regarded as true." *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983).

A plaintiff must, however, provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action is not enough. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The factual allegations must be enough to raise a right to relief above the speculative level. *Id.* at 555.

Accordingly, to survive a motion to dismiss under Rule 12(b)(6), a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some viable* legal theory." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir.1995) (emphasis added).

## Discussion

In support of its motion and in opposition to defendants' motion, Lynx argues: 1) defendants' proposed new affirmative defenses are time-barred; 2) defendants have no standing to bring breach of fiduciary duty or fraud claims against Lynx; 3) Lynx and Snell did not owe Ultimate Systems a fiduciary duty not to compete; and 4) Ohio law precludes fraud claims based solely on a theory that a party never intended to perform under a contract. I address each argument in turn.

### A. Affirmative Defenses Time-Barred

Defendants allege Snell knowingly sold RTH substandard and defective equipment for the Banbury Line. (Doc. 49-1 at 11-12 ¶¶ 100-01). Based on that allegation, defendants asserted in their original answer counterclaims for breach of fiduciary duty and fraud. (Doc. 35 ¶¶ 50-68). In its motion to dismiss those counterclaims, Lynx argued that a four year statute of limitations barred those counterclaims. (Doc. 38 at 4-6); *see* O.R.C. §§ 2305.09 (C)-(D).

Defendants now propose to recast their original counterclaims as affirmative defenses. Lynx surmises that although defendants do not state so explicitly, they presumably believe that they are entitled to set off any counterclaim damages actions against any damages defendants owe on Lynx's claims.

Lynx argues that such a defense is untimely. I agree.

The affirmative defense of set-off "arises out of a transaction other than the one giving rise to plaintiff's claim." *CSX Transp. v. Globe Metallurgical, Inc.*, 2007 WL 1567690, *9 (S.D. Ohio). A set-off is a demand asserted to diminish or extinguish a plaintiff's demand, which arises out of a transaction different from that sued on. *Akron Nat. Bank & Trust Co. v. Roundtree*, 60 Ohio App. 2d 13, 17 (Ct. App. 1978).

13

Ohio courts distinguish between claims of set-off and claims of recoupment. *See Wagner v. Circle W. Mastiffs*, 2010 WL 10009904, *6 (S.D. Ohio) (collecting cases). As I noted, sitting by designation in *Waite, Schneider, Bayless & Chesley Co., L.P.A. v. Davis*, 2015 WL 3505793, *2 (S.D. Ohio) (internal quotations omitted), recoupment is a defense which "arises out of the same transaction as plaintiff's claim, is a claim of right to reduce the amount demanded [by the plaintiff,] and can be had only to an extent sufficient to satisfy the plaintiff's claim.".

In deciding whether two claims arise from the same transaction, courts applying Ohio law ask whether the claims involve "distinctive legal and factual questions, arise at different times[,] and involve different sets of evidence." *Wagner*, 2010 WL 1009904 at *6.

Here, Lynx's claims implicate legal and factual questions distinct from those defendants' assert in their proposed new affirmative defenses. Defendants' new claims relate to equipment sales; Lynx's claims, in contrast, arise from alleged misconduct affecting Lynx's rights and status as an LLC member. *Cf. CSX*, 2007 WL 1567690, *8–9 (defendant's claim that railroad damaged its property while moving freight did not arise out of same transaction as plaintiff's claim that defendant failed to pay railroad's freight charges); *Lightbody v. Rust*, 2003 WL 21710601, *10 (Ohio Ct. App.) (defendant lawyer's claim that former partner breached contingency-fee contract arose from different transaction than plaintiff claims related to defendant's professional misconduct on leaving former firm).

Moreover, determining the viability of these proposed new defenses "requires considering a substantial amount of evidence unrelated to, and unnecessary to prove, [Lynx's] claims." *Waite, Schneider*, 2015 WL 3505793, *3. For example, to prevail, defendants would need to prove the equipment Snell sold RTH actually failed to function as intended and expected.

14

Defendants' proposed affirmative defenses thus are in the nature of set-off rather than recoupment. As such, they are time-barred because "if the statute of limitations has run for the underlying cause of action, the defense of set-off is barred." *Id.*; *see Thirty-Four Corp. v. Hussey,* 1985 WL 10275, *4 (Ohio Ct. App.) ("[S]ince this debt is not a strict defense to [plaintiff's] claim, it is subject to the bar of the applicable statute of limitations."); *Riverside Methodist Hosp. Ass'n of Ohio v. Guthrie,* 3 Ohio App.3d 308, 311 (Ct. App.1982) ("If the statute of limitations had run, either a setoff or counterclaim would be barred.") (citing *Summers v. Connolly,* 159 Ohio St. 396, 406 (1953)).[9]

## B. Standing

Defendants claim that Snell breached a fiduciary duty to them by competing with Ultimate Systems for customers in the United States market. Defendants also claim that Snell committed fraud when he agreed not to compete with Ultimate Systems because he never intended to honor that agreement.

Defendants' arguments are flawed on multiple grounds. As a threshold matter, defendants have no standing to assert these claims. Snell's agreement not to compete with Ultimate Systems in exchange for a $40,000 annual payment was with RTH, not with defendants in their individual capacities. Thus, if Snell committed any fraud (which, as a matter of law, he did not, see *infra*), it was against RTH, not defendants. Likewise, if Snell breached any fiduciary duty (which, as a matter of law, he did not, see *infra*), it was against Ultimate Systems, not defendants.

---

[9] While defendants correctly point out *Summers* states that statutes of limitations do not bar ordinary defenses, the defenses here have "the nature and characteristics of an independent action," and therefore are by statute subject to limitations. *Summers,* 159 Ohio St. at 404.

Ohio law is clear that a "member of a limited liability company lacks standing to assert claims individually where the cause of action belongs to the company." *TD Ltd. LLC v. Dudley*, 2014 WL 4534927, *4 n.2 (Ohio Ct. App.) (citations and quotations marks omitted); *see Ogle v. Hocking Cty.*, 2014 WL 6977628, *6 (Ohio Ct. App.) (no standing to sue because "a limited liability company is a legal entity capable of suing and being sued in Ohio") (citing O.R.C. § 1705.03(A)). Defendants therefore cannot assert a fraud claim or a breach of fiduciary duty claim because those claims, if meritorious, would belong to RTH and Ultimate Systems (or any successors in interest), respectively, neither of which is a party to this lawsuit.

### C. Breach of Fiduciary Duty

Apart from the standing problem, defendants' breach of fiduciary duty claim, resting on Snell's alleged competition with Ultimate Systems for United States customers, is not cognizable in Ohio. This is so because in Ohio no fiduciary obligation restrains a member of an LLC from competing with the LLC where, as here, the LLC's operating agreement expressly authorizes such competition. *McConnell v. Hunt Sports Ent.*, 132 Ohio App. 3d 657, 675-76 (Ct. App. 1999) (member of an LLC, which had been formed for purpose of investing in and operating professional hockey franchise, did not owe fiduciary duty to LLC not to form separate corporation which competed with LLC in bidding for expansion franchise, where membership agreement expressly provided that members were not barred from competing with LLC).

Here, Section 5.3 of Ultimate Systems' operating agreement expressly allows its members to compete with Ultimate Systems:

> **Other Business Ventures**. Each of the Members may engage in and possess an interest in any other professional or business venture of any nature or description whatsoever, independently or with others,

16

including, but not limited to, the acquisition, ownership and operation of ventures competitive with, and similar in nature to, the business conducted by the Company [Ultimate Systems]. Neither the Company nor any other Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

(Doc. 1-1 at 6).[10]

In short, the Ultimate Systems Operating Agreement precludes defendants' breach of fiduciary duty claim.

### D. Fraud

Finally, defendants argue Snell committed fraud because he never intended to honor his agreement with RTH not to compete with the Ultimate Systems and the Banbury Line. That argument is untenable.

Ohio law precludes a fraud claim premised solely on the theory that a party never intended to keep a solely contractual promise. *See, e.g.*, *Infocision Management Corp.*, 2009 WL 2244166, *5 (N.D. Ohio) (fraud claim based on theory that party did not intend to perform barred). Snell's alleged misrepresentation is not collateral to the contract; rather, it constitutes the essential bargain promised therein. *See, e.g.*, *Issac v. Ebix, Inc.*, 2012 WL 1020296, *5 (S.D. Ohio) (no fraud claim when alleged misrepresentations were the same promises expressly included in the contract); *Stalvey v. NVR, Inc.*, 2011 WL 3472385, *6-7 (N.D. Ohio) (fraud claim not viable when based on same conduct plaintiff alleged was violation of contract); *Thornton v. Cangialosi*, 2010 WL 2162905, *3 (S.D. Ohio) (fraud claim must be based on breach of duty separate from duty the contract created); *Gator Dev. Corp. v. VHH, Ltd.*, 2009 WL 1027584, *4 (Ohio Court App.) (fraud claim barred when

---

[10] *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading fo all purposes.").

17

"seeking recovery of the same economic loss contemplated by the contract").

Defendants' proposed fraud counterclaim, like its companions, is without merit.

### Conclusion

Because defendants' proposed new affirmative defenses are time-barred, *see Waite, Schneider*, 2015 WL 3505793 at *3, and because their proposed counterclaims would be futile in any event, *see Carson*, 633 F.3d at 495, it is therefore

ORDERED THAT

1.     Defendants' motion for leave to file an amended answer and counterclaim be, and the same hereby is, denied; and

2.      Lynx's motion to dismiss be, and the same hereby is, granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

18